# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MATTHEW LOWMAN,

     Plaintiff,

     v.

UNITED AIRLINES, INC.

     Defendant.

Case No. 19-cv-5575

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Matthew Lowman, a former flight attendant, claims that his former employer, United Airlines, illegally terminated him in violation of the Americans with Disabilities Act (ADA), the Family and Medical Leave Act (FMLA), and state law. Defendant has moved for summary judgment, arguing that the Railway Labor Act (RLA) precludes or preempts Plaintiff's claims, or in the alternative, that Plaintiff fails to raise a genuine issue of material fact as to any of his claims. [35]. For the reasons explained below, this Court grants Defendant's motion.

## I.  Background[1]

### A.  Plaintiff's Employment

From February 2006 through September 2018, Defendant employed Plaintiff as a flight attendant. [38] at ¶ 7. As of November 2007, Plaintiff resided in South

---

[1] This Court takes these facts from Defendant's Statement of Facts [38], Plaintiff's Statement of Additional Facts [40], Plaintiff's Responses to Defendant's Statement of Facts [42], and Defendant's Responses to Plaintiff's Additional Facts [44].

Dakota, but O'Hare International Airport in Chicago served as his "home base." *Id.* A collective bargaining agreement (CBA) between Defendant and the Association of Flight Attendants – CWA (the Union) governed the terms of Plaintiff's employment. *Id.* at ¶ 8. The CBA contains an FMLA policy that applies to Plaintiff. *Id.* at ¶ 78.

During his employment, Plaintiff received training on Defendant's articles of conduct and reviewed, understood, and was familiar with the Flight Attendant Operations Manual/Inflight Policies and Procedures Manual (Manual), which required him "to always interact with [flight attendants] in a professional and respectful manner." *Id.* at ¶¶ 10–11.

In August 2014, Plaintiff entered into a performance settlement with Defendant, pursuant to which he received a "Level 4 warning" in lieu of termination. *Id.* at ¶ 20. The settlement stated that Defendant was issuing the warning to Plaintiff because he called a supervisor a "bitch" and because he falsely accused a supervisor of stalking, harassing, threatening, and intimidating him. *Id.*; [40-5] at 2.

**B.     Events of September 3 and 4, 2018**

Defendant scheduled Plaintiff to work the last leg of a work trip from Boston to Chicago on the evening of September 3, 2018. [38] at ¶ 21. Due to a delay in Chicago, three out of the four flight attendants required to fly the plane "were over their daily duty in terms of how many hours" the CBA allowed them to work in a given day. *Id.* at ¶ 22. The crew had one of two options: they could "waive [ ] legalities and choose to work with the company and get the flight out," or "claim they were

illegal" under the CBA, in which case the CBA obligated Defendant to lay them over until "they were legal to return." *Id.* at ¶ 23.

Plaintiff told inflight service supervisor Michael Simonelli (who came to the gate to assist) that he would waive his legalities and that "if this takes 24 hours to get back to Chicago, [he] d[id]n't care" because he had thrown his medications in his roll-aboard that he had left in Chicago. *Id.* at ¶ 24. Lead flight attendant Derry Bankston also agreed to waive legalities but flight attendant Roy Brown refused, so Defendant canceled the flight. *Id.* at ¶ 27.

Plaintiff then contacted Defendant's scheduling desk about his return flight to Chicago, after which Defendant placed and guaranteed Plaintiff and Bankston seats to "deadhead" (i.e., occupy a seat while off-duty) on the 7:00 a.m. flight back to Chicago the next day. *Id.* at ¶ 29. Defendant also put Plaintiff and Bankston up in a Boston hotel that night. *Id.* Simonelli also talked Plaintiff through calming himself and helped him out of a panic attack, worked with him to see if Plaintiff could get medication in Boston, provided food and toiletries to Plaintiff, and showed him how to get to the hotel. *Id.* at ¶ 30.

The next morning, Plaintiff took the scheduled 7:00 a.m. flight and landed in Chicago at 8:58 a.m. *Id.* at ¶ 31. Chicago onboard supervisor Dana Bastian met Plaintiff and Bankston as they were deplaning because she received a report that they were upset at how they had been treated by scheduling the night before. *Id.* Plaintiff told Bastian "he was not at mental capacity" to be asked questions without his union representative, and Bastian told Plaintiff she was just there to ask

questions and that "there was no disciplinary action" against them, which was true at the time. *Id.* at ¶ 32. Plaintiff, Bankston, and Bastian ended up speaking for about forty-five minutes; during this conversation, Plaintiff told Bastian that Danielle Tate (the scheduling supervisor he had spoken with the previous night) had told him: "we won't help you," and "we don't care." *Id.* at ¶¶ 33–34. During this conversation, Plaintiff also told Bastian that he wanted to use FMLA leave to go home. *Id.* at ¶ 37.

Bastian asked Plaintiff to prepare an inflight operation report (IOR), which employees use to report in-flight incidents. *Id.* at ¶ 35. Plaintiff submitted an IOR on September 5, in which he similarly reported that Tate had told him that she did not care, that his medication was of no concern to her, and that she had hung up the phone on him. *Id.* After speaking with Bastian, Plaintiff took the first scheduled flight at 12:50 p.m. back home. *Id.* at ¶ 37.

Plaintiff admits that he is unaware of any side effects he may have suffered due to the 12-hour delay (from 10:00 p.m. on September 3, 2018 to 10:00 a.m. on September 4, 2018) in taking his medication for depression (Citalopram) or HIV (Stribild). *Id.* at ¶ 38. He claims, however, that the "big problem was the hydroxyzine," a medication Plaintiff takes for panic attacks and anxiety. *Id.* Plaintiff began taking hydroxyzine in March 2018, and with the exception of the evening of September 3, 2018, had always carried it with him. *Id.* at ¶ 39. According to Plaintiff, "anything" can trigger a panic attack. *Id.* at ¶ 40.

### C.    Plaintiff's Termination

On September 5, 2018, Defendant's management listened to a recording of Plaintiff's call with the scheduling desk from the evening of September 3, 2018, after the flight back to Chicago was canceled.  *Id.* at ¶ 41.  In the recording, Plaintiff could be heard first yelling at scheduler Jasmine Cunningham that he wanted to be on a 5:00 a.m. flight in the morning:

> PLAINTIFF: Because – I said – I said I wanted to be on the 5:00 a.m. flight in the morning deadheading because this should not have been canceled.
>
> MS. CUNNINGHAM: Ok. Well, it – you won't be –
>
> PLAINTIFF: And we had – and we had – and we had –
>
> MS. CUNNINGHAM: – legally in the ID. I can –
>
> PLAINTIFF: I don't care.
>
> MS. CUNNINGHAM: Excuse me. Can you please not yell?
>
> PLAINTIFF: I want to go out at 5:00 a.m.
>
> MS. CUNNINGHAM: Can you please not yell? I'm not even done talking. You're not listening.
>
> PLAINTIFF: No. Because I have medication in Chicago.

*Id.* at ¶ 42.

Cunningham then transferred the call to supervisor Danielle Tate, who told Plaintiff that there was a "problem with – when you're yelling at co-workers," to which Plaintiff responded, "I know."  *Id.* at ¶ 43.  Plaintiff then told Tate: "And I told her to put me on the 5:00 a.m., and she said you're not legal. I said I don't care. And I have – I actually have the personal phone number" of the daughter of a United executive

who was a passenger on the flight and had told Plaintiff she could contact her father to help get the flight out. *Id.* at ¶ 44.

After management listened to the recording, on September 6, Plaintiff's supervisor, Rosalyn Bishop, sent Plaintiff a letter. *Id.* at ¶ 51. In the letter, Bishop informed Plaintiff that Defendant had scheduled a meeting for the next day to investigate his call with Cunningham and Tate on September 3, his statement to Bastian on September 4, and his IOR. *Id.*

As a result of the investigation and following the September 7 meeting, Bishop concluded that Plaintiff's actions of yelling at coworkers and then lying about the conversation warranted termination. *Id.* at ¶ 53. Instead of terminating him, however, Bishop offered Plaintiff a settlement at a "Level 4 performance warning." *Id.* The settlement offer required Plaintiff to execute a private waiver and release of claims against Defendant in order to retain his employment. [40] at ¶ 9. But Plaintiff rejected the settlement, and thus, Bishop wrote Plaintiff on September 28, 2018, terminating him based upon the serious nature of his dishonesty and behavior, and for violating the Manual, which required him to act honestly and professionally. [38] at ¶ 54; [42] at ¶ 54.

Before offering Plaintiff the settlement that he ultimately rejected, Bishop recommended offering Plaintiff a settlement that included a referral to Employee Assistance Program (EAP) for "any" emotional or behavioral issues. [44] at ¶ 8. Bishop testified that she recommended the EAP due to Plaintiff's tone, which she found "disrespectful" in a "very short amount of time." *Id.* But because she was told

she could only recommend it outside of the settlement, Bishop removed the referral to EAP from the settlement offer she presented to Plaintiff. *Id.*

In his deposition, Plaintiff admitted that the statements he made to Bastian, and in the IOR about what scheduling had said to him, were not reflected in the recording. [38] at ¶ 49. Plaintiff also testified to having a panic attack during his call with the schedulers on September 3. *Id.* at ¶ 47.

### D. Plaintiff's Claims

Plaintiff filed a five-count complaint against Defendant in 2019. [1]. The complaint brings claims for: (1) disability discrimination in violation of the ADA (Count I); (2) ADA retaliation (Count II); (3) FMLA interference (Count III); (4) FMLA retaliation (Count IV); and (5) intentional infliction of emotional distress (Count V). *Id.* Defendant has moved for summary judgment on all counts [35], and Plaintiff has opposed the motion, [41].

## II. Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-

moving party. *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020).

The non-moving party bears the burden of identifying the evidence creating an issue

of fact. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021–22 (7th Cir.

2018). To satisfy this burden, the non-moving party "must do more than simply show

that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Barnes v. City of*

*Centralia*, 943 F.3d 826, 832 (7th Cir. 2019). Thus, a mere "scintilla of evidence"

supporting the non-movant's position does not suffice; "there must be evidence on

which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S.

at 252.

## III.    Analysis

In moving for summary judgment, Defendant argues that the Railway Labor

Act (RLA) bars Plaintiff's claims in their entirety, and that alternatively, Plaintiff

fails to present sufficient evidence to create a triable issue of fact on any of his claims.

[35]. This Court addresses the threshold issue of RLA preclusion/preemption[2] before

turning to the merits of the parties' arguments.

### A.    The RLA Preclusion/Preemption

#### 1.    "Minor" Disputes Under the RLA

Congress enacted the RLA in 1926 out of a concern that the "nation's

transportation network" might be "brought to a standstill because of labor conflict."

---

[2] "Preclusion" means that a federal statute displaces a *federal* claim, whereas "preemption" means that a federal statute displaces a *state* claim. *Brown v. Ill. Cent. R.R. Co.*, 254 F.3d 654, 661 (7th Cir. 2001).

*Bhd. of Locomotive Eng'rs & Trainmen (Gen. Comm. of Adjustment, Cent. Region) v. Union Pac. R.R. Co.*, 879 F.3d 754, 755 (7th Cir. 2017). The RLA "is designed to substitute bargaining, mediation, and arbitration" for strikes, and thus, a "strong preference for arbitration, as opposed to judicial resolution of disputes," inheres in the RLA. *Id.*

The RLA provides a mandatory and exclusive arbitral mechanism for "minor" disputes between air carriers and their employees. *Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011). "Minor" disputes are those "'growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions.'" *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 831 (7th Cir. 2014) (quoting 45 U.S.C. § 153(i)); *see also Bhd. of Locomotive Eng'rs*, 879 F.3d at 756. Consequently, where a claim requires interpretation of a CBA or can be "conclusively resolved" by interpreting the CBA, this Court classifies it as a "minor" dispute subject to mandatory arbitration. *Brown v. Ill. Cent. R.R. Co.*, 254 F.3d 654, 658 (7th Cir. 2001).

The Seventh Circuit has not yet expressly resolved whether the application of the RLA's mandatory arbitration provision divests courts of subject matter jurisdiction or results in a decision on the merits. *See Miller v. Sw. Airlines Co.*, 926 F.3d 898, 901 (7th Cir. 2019); *Carlson*, 758 F.3d at 831. It makes no difference, however, because "either a substantive or a jurisdictional label" ends the litigation between these parties "and forecloses its continuation in any other judicial forum."

*Miller*, 926 F.3d at 901. Against this backdrop, this Court will consider whether the RLA precludes or preempts Plaintiff's claims.

### 2.     ADA and FMLA Retaliation

This Court begins with Plaintiff's ADA and FMLA retaliation claims, which courts analyze under the same framework. *Freelain v. Village of Oak Park*, 888 F.3d 895, 900 (7th Cir. 2018). To prevail on either retaliation claim, Plaintiff must prove that he: (1) engaged in a protected activity; (2) suffered an adverse action; and (3) a causal connection exists between the protected activity and the adverse action. *Williams v. Bd. of Educ. of City of Chi.*, 982 F.3d 495, 508 (7th Cir. 2020) (ADA retaliation), *reh'g denied* (Jan. 7, 2021); *Lutes v. United Trailers, Inc.*, 950 F.3d 359, 363 (7th Cir. 2020) (FMLA retaliation).

The Seventh Circuit's decision in *Carlson* is instructive on whether the RLA precludes Plaintiff's retaliation claims. In *Carlson*, the plaintiff alleged that her employer rejected her request for a reinstatement in retaliation for engaging in protected activity. 758 F.3d at 833. The employer argued that the plaintiff did not qualify for the position she wanted under the relevant CBA, and thus, that RLA preclusion applied because an arbitral ruling could "conclusively resolve" that the plaintiff was unqualified. *Id.* The Seventh Circuit disagreed, explaining that a "claim is not barred simply because "the action challenged by the plaintiff is 'arguably justified' by the terms of the CBA." *Id.* (quoting *Brown*, 254 F.3d at 668). Therefore, as the court held, an employer cannot invoke RLA preclusion merely by asserting certain CBA-based defenses. *Id.* And in *Carlson*, the plaintiff's claims depended upon a pure "'factual inquiry into any retaliatory . . . motive of the employer' rather than

on an interpretation of the collective bargaining agreement." *Id.* (quoting *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 266 (1994)).

Here, as in *Carlson*, Plaintiff's retaliation claims do not require this Court to interpret any provision of the relevant CBA. Plaintiff asserts that Defendant illegally fired him for: (1) requesting an accommodation to deadhead back on an earlier flight; and (2) requesting to use FMLA leave. [41] at 5–6. Whether Defendant violated these statutes depends upon a simple factual inquiry into Defendant's motives for terminating Plaintiff. *See, e.g.*, *Butler v. Ne. Ill. Reg'l Commuter R.R. Corp.*, No. 17 C 7860, 2019 WL 4735397, at *5 (N.D. Ill. Sept. 27, 2019) (finding that the RLA did not preclude the plaintiff's retaliation claim based upon an employer's imposition of a last chance condition based on the plaintiff's race and a prior complaint against the defendant, because the claims "can be resolved only through a factual inquiry into [the defendant]'s discriminatory or retaliatory motive, if any"); *Jibson v. Ne. Ill. Reg'l Commuter R.R. Corp.*, No. 18 C 5594, 2019 WL 2297458, at *7 (N.D. Ill. May 29, 2019) (holding that the RLA did not preclude the plaintiff's retaliation claim because factual questions regarding the defendant's retaliatory motive did not require interpretating the CBA). This Court thus finds that the RLA does not preclude Plaintiff's retaliation claims.

### 3. ADA Discrimination Claim

This Court similarly finds that the RLA does not preclude Plaintiff's ADA discrimination claim. To prevail on this claim, Plaintiff must prove that: (1) he was disabled; (2) he was otherwise qualified to perform essential functions with or without

reasonable accommodation; and (3) the disability was the but for cause of an adverse employment action. *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020).

In *Brown v. Illinois Central Railroad Co.*, the Seventh Circuit held that the RLA does not preclude ADA discrimination claims if either: (1) the parties do not dispute the interpretation of the CBA; or (2) the disputed CBA provisions were relevant but not dispositive of the claim (because a CBA's provisions describing job functions might be relevant to the ADA claim's "essential function" element). 254 F.3d at 668. Plaintiff's ADA claim falls into both categories of non-precluded claims. Neither party disputes the interpretation of the CBA, and neither party argues that the CBA's provisions might dispose of the claim. *See generally* [41]; [43]. Accordingly, the RLA does not preclude Plaintiff's disability discrimination claim. *See, e.g.*, *Anderson v. United Air Lines, Inc.*, No. CIV. A. 09 C 3210, 2010 WL 653491, at *3 (N.D. Ill. Feb. 22, 2010) (concluding that the RLA did not preclude an ADA claim that did not involve a dispute over the meaning of any CBA provision).

### 4. FMLA Interference

The analysis differs for Plaintiff's FMLA interference claim, which requires Plaintiff to prove the following elements: (1) Plaintiff was eligible for FMLA; (2) Defendant was covered under the FMLA; (3) the FMLA entitled Plaintiff to leave; (4) Plaintiff provided notice of his intent to take leave; and (5) Defendant denied Plaintiff his entitled benefits. *Lutes*, 950 F.3d at 363. Unlike the other claims, Plaintiff's FMLA interference claim requires this Court to interpret the CBA.

Plaintiff claims that Defendant denied him FMLA leave to which he was entitled and that he would have used to fly back to Chicago on September 3. [41] at

12.  In turn, Defendant asserts that Plaintiff had already exceeded his daily duty hours under the CBA, thus arguing that "there was no work from which he could take leave."  [38] at ¶ 22; [43] at 14.  Clearly, resolving Plaintiff's entitlement to FMLA leave on September 3 requires this Court to interpret the CBA, which contains the FMLA policy applicable to Plaintiff, as well as provisions concerning flight attendants' maximum daily duty hours.  *See* [38] at ¶¶ 22, 78; *see also, e.g.*, *VanSlyck v. GoJet Airlines, LLC*, 323 F.R.D. 266, 270 (N.D. Ill. 2018) (concluding that the RLA precluded the plaintiff's FMLA interference claim based upon allegations that the defendant failed to give the plaintiff a modified schedule because the defendant showed that the modified scheduled plaintiff requested would have violated various provisions of the CBA).  Moreover, if Defendant's construction is correct (i.e., that the CBA would not have allowed Plaintiff to take leave on September 3), then Plaintiff could not prove an essential element of his claim.  A such, the claim requires interpretation of the CBA (or otherwise can be "conclusively resolved" by interpreting the CBA), and therefore, the RLA precludes Plaintiff's FMLA interference claim and this Court grants summary judgment to Defendant on that claim.  *Brown*, 254 F.3d at 658; *see Miller*, 926 F.3d at 901 (noting that "either a substantive or a jurisdictional label ends the litigation between these parties and forecloses its continuation in any other judicial forum").

### 5.  IIED

Plaintiff also brings a common law claim for IIED in Count V of his complaint. Because Plaintiff fails to address this claim in his response to Defendant's motion for summary judgment, this Court deems it abandoned.  *Robertson v. Dep't of Health*

*Servs.*, 949 F.3d 371, 374 n.2 (7th Cir. 2020). Regardless, for the sake of completeness, this Court will assess Defendant's arguments on this claim.

To succeed on his IIED claim, Plaintiff must prove: (1) Defendant's conduct was outrageous; (2) Defendant intended to inflict severe emotional distress; and (3) Defendant's conduct, in fact, caused Plaintiff severe emotional distress. *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 933–34 (7th Cir. 2017). In his complaint, Plaintiff alleges that Defendant engaged in outrageous conduct by refusing to provide him a flight out of Boston on September 3 and by interrogating Plaintiff upon arrival in Chicago on September 4 before allowing him access to his medications. [1] at ¶¶ 60–61.

Determining whether Defendant intended to cause Plaintiff emotional distress by engaging in these actions does not depend upon an interpretation of the CBA, but instead upon a factual analysis of Defendant's actions and intent. The RLA therefore does not preempt Plaintiff's IIED claim.

## B.     Evidence of Plaintiff's Claims

Because this Court has found that the RLA does not bar Plaintiff's claims for ADA and FMLA retaliation, ADA discrimination, or IIED, it now turns to determining whether Plaintiff has presented sufficient evidence to overcome summary judgment on those claims.

### 1.     ADA and FMLA Retaliation

As discussed above, to prevail on his retaliation claims, Plaintiff must prove that: (1) he engaged in a protected activity; (2) he suffered an adverse action; and (3) a causal connection exists between the protected activity and the adverse action.

*Williams*, 982 F.3d at 508.  In this case, Plaintiff claims that Defendant terminated him because he engaged in two protected activities: the first on September 3 when he requested that Simonelli grant him "the reasonable accommodation of being permitted to deadhead" on the evening flight to Chicago, and the second on the same day when he "requested to utilize his FMLA leave" in order to return to Chicago.  [41] at 5–6.  The parties dispute the first (protected activity) and third (causation) elements of Plaintiff's retaliation claims.  Regardless of whether his actions amounted to protected activities, Plaintiff's claims fail for his lack of evidence on causation, so this Court's analysis focuses upon that element.

Plaintiff must prove causation by presenting either direct evidence (in the form of an admission) or circumstantial evidence.  *Rowlands v. United Parcel Serv. – Fort Wayne*, 901 F.3d 792, 801–02 (7th Cir. 2018).  Because Defendant does not admit to retaliation, Plaintiff must proceed by way of presenting circumstantial evidence.  The Seventh Circuit has instructed that such evidence can include: (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically received better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.  *Id.*; *Carter v. Chi. State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015).

Plaintiff argues that the record shows that Defendant offered a pretextual reason for his termination.  [41] at 7–8.  In this context, pretext means something "more than just faulty reasoning or mistaken judgment on the part of the employer;

it is [a] lie, specifically a phony reason for some action." *Koty v. DuPage County*, 900 F.3d 515, 519 (7th Cir. 2018) (quoting *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 698 (7th Cir. 2017)).  In assessing pretext, this Court will not second-guess employers' business decisions.  Rather, it asks simply whether "an employer's reason for a termination is without factual basis or is completely unreasonable." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013); *see also Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017).

Here, it is undisputed that Plaintiff yelled at his colleagues over the phone on a work trip, that he subsequently lied about this interaction to another colleague and in his IOR, and that Defendant possessed an ample factual basis to fire Plaintiff due to this unprofessional and dishonest conduct in violation of the company's Manual. No reasonable jury could find Defendant's actions pretextual or otherwise "without factual basis or . . . completely unreasonable" based upon this record. *Hobgood*, 731 F.3d at 646.

Notwithstanding, Plaintiff argues pretext based upon the fact that his 2014 settlement with Defendant differed from the 2018 settlement offer.  [41] at 7–8. Those differences include: (1) the fact that the 2018 settlement offer included a release of claims benefitting Defendant; (2) Plaintiff's request for FMLA leave three weeks prior to the 2018 settlement offer; and (3) Plaintiff's use of a profanity in 2014, which Plaintiff suggests is more egregious yet did not result in his termination.  *Id.* Merely pointing to these different business judgments (made by different decisionmakers taking into account the relevant circumstances of each incident),

however, does not demonstrate pretext; nor does it provide a sufficient evidentiary basis to infer that these differences can be attributed to retaliatory animus, rather than Defendant's proffered explanation for Plaintiff's termination—an explanation both legitimate and justified given the undisputed severity of his misconduct.

Plaintiff also attempts to establish circumstantial evidence of causation through timing, arguing that "his termination was effectuated a mere twenty-five days after he last engaged in protected activity." [41] at 7. Generally, unless a mere few days elapse between the protected activity and the adverse employment action, suspicious timing is insufficient, on its own, to overcome summary judgment on causation. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 578–79 (7th Cir. 2021) (citing *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012)). Because more than a few days elapsed between the alleged protected activity and Plaintiff's termination in this case, Plaintiff must present "other circumstantial evidence of retaliation" in addition to suspicious timing. *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 633 (7th Cir. 2020). He has not, and this failure dooms his reliance upon timing as his circumstantial evidence of causation.

Likewise, the Seventh Circuit has also warned that evidence of Plaintiff's "own aberrant actions or other intervening circumstances" undermines a suspicious-timing argument. *Kidwell*, 679 F.3d at 967. That is the case here. Plaintiff admittedly yelled and then lied to his colleagues, and these events took place on the same day, and the day after, he allegedly engaged in the statutorily protected activities of

requesting an accommodation and FMLA leave. The severity and timing of Plaintiff's conduct directly undermines an inference of suspicious timing.

In short, Plaintiff offers insufficient evidence of causation. Despite his own inadmissible speculation (that Defendant took the more drastic step of terminating him in 2018 due to a retaliatory motive), Plaintiff therefore fails to create a genuine issue of material fact on his retaliation claims. *See McCann v. Badger Mining Corp.*, 965 F.3d 578, 592 (7th Cir. 2020) (rejecting a plaintiff's pretextual arguments based upon speculation and conjecture); *Atanus v. Perry*, 520 F.3d 662, 674 (7th Cir. 2008) (holding that the plaintiff's race discrimination claim failed where the evidence showed that the employer's reason for suspending the plaintiff was due to her "insubordinate, disorderly and rude conduct" and the plaintiff offered nothing other than "her belief" that the reason was pretextual). This Court grants summary judgment to Defendant on Plaintiff's retaliation claims in Counts II and IV.

### 2. ADA Discrimination Claim

Plaintiff's disability discrimination claim is similarly deficient. To prove his ADA discrimination claim, Plaintiff must demonstrate the following three elements: (1) he was disabled; (2) he was otherwise qualified to perform essential functions with or without reasonable accommodation; and (3) the disability was the but for cause of an adverse employment action. *Castetter*, 953 F.3d at 996. Like his retaliation claims, Plaintiff's failure to present proof of causation is dispositive of Plaintiff's disability discrimination claim, and this Court's analysis focuses on that element.

In assessing causation, this Court asks whether a reasonable juror could conclude that Plaintiff would have kept his job if he was not disabled, and "everything

else had remained the same." *McCann*, 965 F.3d at 589 (quoting *Graham v. Arctic Zone Iceplex, LLC*, 930 F.3d 926, 929 (7th Cir. 2019)). As with his retaliation claims, Plaintiff must prove causation on his discrimination claim, and can do so through direct or circumstantial evidence. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017).

Here again, Plaintiff lacks direct evidence on causation, and instead argues, as he did with his retaliation claims, that Defendant offered pretextual reasons for his termination. [41] at 11. Because Plaintiff merely incorporates his pretext arguments from his retaliation claim, the analysis here remains the same as to why the record fails to show pretextual reasons for terminating Plaintiff.

Plaintiff additionally attempts to provide evidence of causation by referencing the fact that Bishop initially recommended referring Plaintiff to an employee assistance program for emotional or behavioral issues. [41] at 11. This action, Plaintiff argues, shows that Defendant "openly considered" his disability in its decision to terminate him. *Id.* Here, Plaintiff conflates the concept of terminating an employee *because of misconduct related to his disability* with that of terminating an employee *because of his disability*. It is well-established that the ADA permits an employer to "terminate an employee for inappropriate behavior even when that behavior is precipitated by the employee's disability." *Monroe*, 871 F.3d at 506–07 (internal quotation marks omitted); *see also Tate v. Ancell*, 551 F. App'x 877, 885 (7th Cir. 2014) ("We have . . . reasoned that an employee's disability will not preclude an employer from imposing discipline, up to and including discharge, for the employee's

violation of a workplace rule, even when there is a connection between the disability and the violation."). In this case, the undisputed record shows that Defendant terminated Plaintiff because Plaintiff engaged in misconduct, which may have been caused by his alleged disability (panic attacks), but not because of his disability. No ADA liability attaches under such circumstances.

Moreover, this Court finds nothing nefarious about Bishop's recommendation for Plaintiff to undergo a program aimed at helping him through any emotional or behavioral issues, because an employer's "knowledge of, and conscientious responses to, an employee's disability are not evidence of discrimination." *McCann*, 965 F.3d at 595. Bishop testified that she only recommended the program due to Plaintiff's tone in the call with the schedulers, which she found "disrespectful" in a "very short amount of time," [44] at ¶ 8, and, as discussed, the record corroborates Bishop's observations.

In sum, because the record lacks sufficient evidence of causation, this Court grants summary judgment to Defendant on Plaintiff's disability discrimination claim in Count I.

### 3. IIED

Finally, as discussed above, Plaintiff has failed to address his IIED claim, and thus, has abandoned it. Even if he had not, the record contains no evidence that Defendant engaged in "extreme and outrageous" conduct, or in other words, "conduct that goes beyond all possible bounds of decency." *Parker v. Side by Side, Inc.*, 50 F. Supp. 3d 988, 1023 (N.D. Ill. 2014) (quoting *Duffy v. Orlan Brook Condo. Owners' Ass'n*, 981 N.E.2d 1069, 1079 (lll. App. Ct. 2012)). Nor is there evidence of

Defendant's intent to cause emotional distress. *See McGreal v. Village of Orland Park*, 850 F.3d 308, 314 (7th Cir. 2017) (noting that an IIED claim requires proof of intent). Accordingly, this Court grants summary judgment to Defendant on this claim as well.

## IV. Conclusion

For the reasons explained above, this Court grants Defendant's motion for summary judgment [35]. The Clerk is directed to enter judgment in Defendant's favor on the merits of Plaintiff's claims in Counts I, II, IV, and V. The Clerk is also directed to enter judgment in Defendant's favor on Count III based upon claim preclusion under the Railway Labor Act. *See Miller*, 926 F.3d at 901. All dates and deadlines are stricken. Civil case terminated.

Dated: May 19, 2021

Entered:

John Robert Blakey
United States District Judge